J-A26021-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| MILES K. JONES | : | |
| | : | |
| Appellant | : | No. 1442 EDA 2022 |

Appeal from the Judgment of Sentence Entered November 18, 2021
In the Court of Common Pleas of Bucks County Criminal Division at
No(s):  CP-09-CR-0000820-2020

BEFORE:  DUBOW, J., McLAUGHLIN, J., and KING, J.

MEMORANDUM BY McLAUGHLIN, J.:                    **FILED MARCH 27, 2024**

Miles K. Jones appeals from the judgment of sentence entered following his convictions of two counts of first-degree murder, 13 counts of recklessly endangering another person ("REAP"), one count of possessing an instrument of crime ("PIC"), and one count of firearms not to be carried without a license.[1] We affirm.

Jones went on a camping trip with his girlfriend, Kristen Wright, and 11 other people. Jones did not know any of the other campers. Jones and Wright got into an argument, during which Jones flipped over a tent with Wright still inside. Some of the other campers came to Wright's defense. Arthur Hill placed himself between Jones and the tent, and Jones shoved Hill. One of Hill's sons, Justin Hill ("Justin"), punched Jones in the face, knocking him to the ground.

_____

[1] *See* 18 Pa.C.S.A. §§ 2502(a), 2705, 907(b), and 6106(a)(1), respectively.

After the fray, Jones announced "that it wasn't over and that they were all going to pay." *See* Trial Court Opinion, 12/22/2022, at 4; *see also id.* at 4 n.37.

Jones went to Wright's car to "cool off," but returned soon after with his handgun. *Id.* at 5-6. When one of the campers, Eric Braxton, gestured for Jones to return to the car, Jones shot him in the chest from two feet away, killing him. Jones fired another handful of shots at the other campers as they fled into the woods, calling for help. One of these shots struck Hill in the back. Hill was later transported to the hospital, where he was pronounced dead. According to the placement of the shell casings and the victim's bodies, there were 66 feet between where Jones fired the shot that killed Braxton and where he fired the shot that killed Hill. The police arrived, arrested Jones, and transported him to a hospital. There was conflicting testimony on Jones's level of intoxication at the time of the shootings. *Id.* at 33. He did not have a license to carry a firearm.

Jones testified, claiming he had acted in self-defense. He stated that during his argument with Wright, he asked her to take him home, and she refused. *See* N.T., 11/10/21, at 79. Jones shoved the tent pole but did not expect the tent to flip on its side. *Id.* at 80. Jones said that Hill, Justin, and another of Hill's sons, Brandon ("Brandon"), then approached, and Hill pushed Jones. *Id.* at 81-82. Jones "told them to get the fuck out of [his] face[.]" *Id.* at 82. Justin then punched Jones, and he fell to the ground. *Id.* When Jones tried to get up, someone punched him a second time. *Id.* When he fell, he hit

his head and lost consciousness. *Id.* He awoke to being stomped on the ground and kicked by multiple people. *Id.* at 82-84. Jones said he then warned the campers that they were not going to get away with the assault, as he intended to report it to the police once he could reach his phone. *Id.* at 83.

Jones said that after slipping in and out of consciousness, he awoke in Wright's car. *Id.* at 85. He was in pain and afraid the campers would attack him again. *Id.* at 85-86. According to Jones, he tried to get out of the car to retrieve his phone but was told to stay inside. *Id.* at 86. Jones said he believed the campers had his phone but would not give it to him. *Id.* at 87-88. Jones grabbed his firearm with the intention of running away. *Id.* However, when he exited the car and tried to walk, his ankle buckled, and he had to limp. *Id.* at 89. When he was a few steps away from the car, Braxton approached him to prevent him from leaving. *Id.* Jones told him to move out of the way, but Braxton tried to grab him. *Id.* As Jones backed away, Braxton continued to move towards him. *Id.* Jones then saw Hill and the Hill brothers running towards him from behind. *Id.* at 89-90. Afraid that they were going to attack him again, and unable to run away, Jones shot Braxton and then shot towards Hill and the Hill brothers. *Id.* at 90. Jones testified he fired another shot accidentally as he lost balance. *Id.* He then tried to run and yelled for the others to call the police. *Id.* at 92.

The jury convicted Jones of the above-listed crimes. The court sentenced him to two mandatory terms of life imprisonment for the first-degree murders of Braxton and Hill, 13 terms of one to two years' imprisonment for the REAP

convictions, three and a half to seven years' imprisonment for firearms not to be carried without a license, and two and a half to five years' imprisonment for PIC. The court ran each sentence consecutively. Following the court's denial of his post-sentence motions, Jones timely appealed.[2]

Jones raises the following issues:

A. Did the trial court err in its ruling regarding the admissibility and scope of permissible evidence regarding the prior convictions of Brandon Hill and Justin Hill?

B. Did the trial err in issuing a number of improper evidentiary rulings?

C. Did the trial court err in refusing to inquire as to whether the jury overheard the trial court loudly reprimanding counsel?

D. Did the trial court err in denying [Jones's] **Brady** motion[3] and in refusing to give a missing evidence jury instruction?

E. Did the trial court err in repeatedly allowing the Commonwealth to question witnesses regarding [Jones's] post arrest silence?

_____

[2] The docket reflects that following *voir dire*, the trial took place on November 1, 3, 4, 5, 8, 9, 10, 12, and 15, 2021. Although the defense moved for transcription of each date of trial, and the court entered an order granting the motion, no notes of testimony were ever filed for the proceedings that took place on November 9, 2021, and that transcript is not included in the certified record. According to a court sheet filed on the docket, the defense presented 10 witnesses that day. Our informal inquiry has revealed that the transcript is not in the possession of the trial court. Nonetheless, neither Jones's brief nor his reply brief includes any citation to the testimony on November 9. Its absence has not posed a substantial impediment to appellate review. Just the same, it is an appellant's burden to ensure the certified record is complete. Therefore, any argument that the November 9, 2021 transcript would support Jones's arguments, or that we have misconstrued the proceedings on that day, is waived. **See Commonwealth v. O'Black**, 897 A.2d 1234, 1238 (Pa.Super. 2006).

[3] **See Brady v. Maryland**, 373 U.S. 83 (1963).

F. Did the trial court err in denying [Jones's] motion to sever the firearms without a license charge?

G. Did the trial court err in giving improper jury instructions?

H. Were the verdicts of guilty supported by sufficient evidence?

I. Did the trial court abuse its discretion in sentencing [Jones] to a sentence which was excessive under the circumstances in light of [Jones's] personal circumstances, his character, and the circumstances of the offense?

J. Were the verdicts of guilty against the weight of the evidence?

Jones's Br. at 14-15 (answers of the trial court omitted).

## I.     Evidentiary Rulings

In issues A, B, and E, Jones challenges the court's evidentiary rulings. We review a trial court's decisions on the admissibility of evidence for an abuse of discretion. *Commonwealth v. Brown*, 212 A.3d 1076, 1086 (Pa.Super. 2019). "An abuse of discretion exists where there is an overriding or misapplication of the law, or the exercise of judgment that is manifestly unreasonable, or the result of bias, prejudice, ill-will or partiality, as shown by the evidence of record." *Commonwealth v. Gross*, 241 A.3d 413, 418 (Pa.Super. 2020) (internal quotation marks and citation omitted). "Moreover, an erroneous ruling by a trial court on an evidentiary issue does not necessitate relief where the error was harmless beyond a reasonable doubt." *Commonwealth v. Lehman*, 275 A.3d 513, 519 (Pa.Super.), *appeal denied*, 286 A.3d 213 (Pa. 2022) (citation omitted).

### A.     Evidence of the Hill Brothers' Prior Bad Acts

Jones first argues the court abused its discretion in limiting the evidence he could present of the prior convictions and pending charges of two of the

other campers: Justin and Brandon. According to Jones, Justin had previously been convicted of two robberies and one prison altercation. He argues that in each criminal episode, Justin punched his victim in the face and knocked the victim to the ground, just as Jones alleges Justin had knocked him out in the instant case. Jones argues the court improperly limited the evidence he was able to present regarding these episodes to the facts read into the record when Justin pleaded guilty in those cases. Jones also asserts that Justin had a pending charge for simple assault. He argues the acts described in the arrest records and charging documents for the previous convictions and pending charge were relevant to prove Justin was the aggressor in the instant case.

Jones asserts the court also abused its discretion in precluding him from introducing evidence that both Hill brothers had pending charges and were released on bail and/or had been serving probation or parole at the time of the shooting. Jones argues this evidence was relevant to prove the brothers testified against him to receive favorable treatment by the Commonwealth and to avoid being found in violation of the requirements of their supervision. He asserts that none of the foregoing evidence would have violated the rules prohibiting the admission of prior bad acts, as those rules apply to restrict the admission of prior bad acts of the defendant, not a witness.

Jones also argues the court erred in giving cautionary instructions preceding the Hill brothers' testimony. He asserts the court told the jury it could not construe the brothers' prior convictions as evidence of their guilt or character, which Jones claims does not apply to witness testimony.

These arguments are without merit. First, as Jones admits, the court allowed Jones to introduce evidence of Justin's prior convictions and the facts to which he pleaded guilty, finding these were relevant to prove Jones's self-defense claim. *See* N.T., 9/21/21, at 12-16 (court ruling at pretrial hearing that evidence of Justin's prior convictions was admissible as relevant to his credibility and violent propensity). However, the court precluded Jones from introducing facts that were alleged in the charging documents but which Justin had not admitted. N.T., 11/4/21 (Morning Session), at 13, 18-19, 32, 34, 38, 40-42, 71 (court limiting facts to those Justin admitted at guilty plea). This was proper, as such statements would have been hearsay. ***See Commonwealth v. Katchmer***, 309 A.2d 591, 593 (Pa. 1973) ("An inquiry as to a mere arrest or indictment is not permitted because an arrest or an indictment does not establish guilt, and the reception of such evidence would merely constitute the reception of somebody's hearsay assertion of the witness' guilt" (citation omitted)).

Moreover, an arrest record is only relevant to a self-defense claim where the defendant claims that his knowledge of allegations in the arrest record led him to believe he needed to defend himself. ***See Lehman***, 275 A.3d at 519-20. Jones has not claimed that he was acting based on his knowledge of the allegations made in Justin's arrest records or charging documents. Nor did Jones offer any non-hearsay evidence of the accusations in these documents. ***See id.*** at 520 (stating eyewitness testimony describing a victim's prior violence is admissible to prove victim's propensity for violence).

Next, contrary to Jones's assertions, the court permitted him to question the Hill brothers about their pending charges and their probation and parole status, and to call their credibility into question on these bases. *See* N.T., 9/21/21, at 6-7, 16 (court ruling that Justin's open assault charge was admissible as motive to lie); 11-12 (ruling that Brandon's being on probation and his pending charge is admissible to challenge his credibility); N.T., 11/3/21, at 166-67 (reiterating that Brandon could be cross-examined about being on probation at the time of the camping trip and his pending charge), 167-70 (reiterating that evidence of Justin's probation status at the time of the instant case and his open charges were admissible). Pursuant to these rulings, Jones questioned the Hill brothers on these points. *See* N.T., 11/4/21 (Morning Session) at 164-66 (defense counsel cross-examining Justin regarding his prior convictions, open charge, and supervision status); N.T., 11/5/21, at 223-28 (defense counsel cross-examining Brandon regarding his probation status and open charge).

Finally, Jones waived any challenge to the cautionary instructions preceding the Hill brothers' testimony, as Jones lodged no objection at the time. *See* N.T., 11/4/21 (Morning Session) at 74-88 (court giving precautionary instruction before Justin's testimony); N.T. 11/5/21, at 153-56 (court giving instruction before Brandon's testimony); *Commonwealth v.*

*Moury*, 992 A.2d 162, 178 (Pa.Super. 2010) ("a specific and timely objection must be made to preserve a challenge to a particular jury instruction").[4]

### B. Bodycam Footage of the Hill Brothers

In Issue B, Jones argues the court abused its discretion in limiting the introduction of bodycam footage of Justin and Brandon after the police arrived at the scene. Jones alleges that in the video, while he is handcuffed and lying on the ground, the Hill brothers attack him and yell, "I'm going to fucking kill him!" Jones's Br. at 34-35. Jones asserts that the court ruled that the defense could only introduce the footage if the Commonwealth could offer, in rebuttal, evidence of Brandon performing CPR on his father, Arthur Hill, after he was shot. Jones argues the bodycam footage was highly relevant to his claim of self-defense, as it shows the Hill brothers were aggressive. Jones asserts the evidence of Brandon performing CPR, in contrast, was irrelevant and inflammatory.

"Evidence is admissible if it is relevant — that is, if it tends to establish a material fact, makes a fact at issue more or less probable, or supports a reasonable inference supporting a material fact — and its probative value outweighs the likelihood of unfair prejudice." ***Commonwealth v. Hicks***, 156 A.3d 1114, 1125 (Pa. 2017) (citation omitted). "'Unfair prejudice' means a tendency to suggest decision on an improper basis or divert the jury's

---

[4] We will address the court's closing instructions regarding the Hill brothers' criminal records in Section VI.A., *infra*.

attention away from its duty of weighing the evidence impartially." *Commonwealth v. Wright*, 961 A.2d 119, 151 (Pa. 2008).

We discern no abuse of discretion. The actions of the Hill brothers after their father had been shot and Jones had been arrested are very weakly probative of how the shooting unfolded. The evidence of Brandon performing CPR would have been equally as relevant as the bodycam footage to show Brandon's state of mind after the shooting. As both items were of low probative value to the facts at issue, and both bore a risk of unfair prejudice, the court's decision to allow both or neither was not manifestly unreasonable.

## C. The Hospital Video

Jones next argues the court erred in allowing the Commonwealth to introduce a video of him receiving or refusing medical treatment at the hospital, two hours after his arrest, and showing that he was intoxicated and belligerent. Jones contends this evidence was highly prejudicial and improper character evidence. He points out that the Commonwealth even replayed the video during its closing argument and said to the jury, "I submit to you this is his character." Jone's Br. at 42. Jones argues that the court should instead have limited the evidence to the officer's testimony about Jones's hospital behavior. Jones also complains the court denied his request to admit video of him at the crime scene after the shooting, two hours earlier. He contends this evidence would have been more probative of his demeanor and level of intoxication at the time of the shooting and was equally as probative of the extent of his injuries.

The court ruled the hospital video was admissible to show the level of Jones's intoxication and the extent of his injuries. We agree with the court that the video is probative on these points. Furthermore, Jones concedes that his behavior at the hospital, while "rude and obnoxious," it was "in no way threatening[.]" *Id.* at 40. This lowers the video's prejudicial impact.

The court also ruled that to the extent the video portrayed Jones's character, it would be admissible to rebut any character evidence Jones introduced. *See* N.T., 11/12/21, at 118-19 (court overruling defense objection to prosecutor's closing remarks because defense presented evidence of Jones's peaceful character); Pa.R.E. 404(a)(2)(A) (providing that prosecutor may offer character evidence to rebut defendant's evidence of a pertinent trait). As Jones introduced evidence of his reputation for peacefulness before the Commonwealth's closing argument, the Commonwealth was properly permitted to use the hospital video in rebuttal.

To the extent Jones complains that the court should also have allowed video of his earlier interactions with the police, as this would have been more probative of his injuries and level of intoxication, this claim lacks merit. Although the court initially ruled the recordings were inadmissible, it later found this evidence was admissible to rebut the hospital video. *See* N.T., 11/8/21, at 35-39.[5]

---

[5] This ruling post-dated the court's ruling that recordings of Jones's statements to the police were inadmissible because they were hearsay. *See* Section I.D., *infra*.

- 11 -

### D.    Recordings of Jones's Post-Arrest Statements

Jones's next argument is that the court erred in refusing to allow bodycam footage of various statements he made to arresting police officers and medical personnel describing his injuries and maintaining that he had acted in self-defense.[6] Jones asserts these out-of-court statements were relevant to his self-defense claim and were admissible under the hearsay exceptions for excited utterances, present sense impressions, declarant's state of mind, and medical diagnosis. He argues his statements were excited utterances because they were made "in response to a startling event, namely, him being assaulted and seriously injured, firing a gun in self-defense, and subsequently being arrested for the first time in his life." Jones's Br. at 45. He also argues that the statements described his present sense and state of mind

_____

[6] Jones sought to introduce recordings of the following statements: "I am not a criminal, please do not be mean to me"; "I am not a threat . . . I have been drinking but I'm not a threat"; "Look at my jaw, my jaw is broken, I am a victim. They whooped my ass"; "My ankle is broken"; "I took an ass whooping and then they wouldn't leave afterwards. They kept hanging around talking about shit"; "I swear to God, officer, I'm the victim"; "I am the victim I swear"; "My ankle is fucked up"; "Let me call my mom please"; "I cannot walk on this"; "Please do not treat me as a criminal. I am not a criminal. I didn't do anything wrong"; "I'm not the bad guy here, I swear to God"; "I'm not the bad guy, I swear, I swear to God"; "Take pictures of my face, do you see my face? So, I know what's happening. Take pictures of my face before you go away . . . get a camera. Your phones. They kicked my ass"; "I was fighting for my life"; "I got injuries to my foot and look at my face"; "I was trying to leave"; "I was just trying to leave. My whole thing was can you please take me home. I was just trying to leave. I didn't want to be there. I swear to God"; "Please don't treat me like I was doing a bad thing. I was just trying to leave"; "I got my ass whooped for saying a smart thing"; "I didn't do anything. I got attacked. See my face, my blood." Jones's Br. at 48-50 (citations omitted).

because they described his fear of being killed by the campers and his physical pain. *Id.* at 46-47.

Insofar as Jones contends that the court precluded his statements describing his physical injuries, his argument is contrary to the record. The court admitted those statements under the hearsay exception for medical diagnosis or treatment. *See* N.T., 11/1/21 at 307, 318, 324, 331-32, 336, 339, 342; Pa.R.E. 803(4) (providing hearsay exception for statements made for medical treatment or diagnosis).

Regarding the other statements, the court initially ruled that no hearsay exception applied to them. The court observed that the statements were either conclusory professions of innocence or a recounting of prior events. The court found the former did not fall into any hearsay category. It found the latter were not excited utterances or present sense impressions because they were made well after the events they described. The court also found they did not describe Jones's state of mind at the time of his arrest. Rather, the court found these statements were made "in response to the fact that the police had immediately taken [Jones] into custody and, being occupied with medical emergencies and scene control, chose not to take a statement from [him] despite his requests that they do so." Trial Ct. Mem. Op. at 87. The court found Jones "was calm and deliberate when making the statements and was clearly attempting to influence the police investigation. He was aware that other witnesses were being interviewed and was attempting to give his account of record and his injuries documented while explaining why the other

witnesses should not be relied upon." *Id.* at 88. The court concluded the statements were made in calculated response to the actions of the police, rather than in response to the excitement of the shooting or the alleged assault on Jones. *Id.* at 87-88; *see also* N.T., 11/1/21, at 328 (court stating, "This is not a running narrative by an emotional person who just witnessed something because the narrative omits 75 percent of what occurred").

The court did not abuse its discretion or misapply the law. It properly concluded that the statements, offered after a period of reflection, did not qualify as excited utterances or present sense impressions. *See* Pa.R.E. 803(1) (defining present sense impression as "statement describing or explaining an event or condition, made while or immediately after the declarant perceived it"); Pa.R.E. 803(2) (defining excited utterance as "statement relating to a startling event or condition, made while the declarant was under the stress of excitement that it caused"); *Commonwealth v. Boczkowski*, 846 A.2d 75, 95 (Pa. 2004) ("[F]or a statement to be considered an excited utterance, it must be made spontaneously and without opportunity for reflection"); *Commonwealth v. Gray*, 867 A.2d 560, 571 (Pa.Super. 2005) (holding for statement to qualify as present sense impression, "[t]he observation must be made at the time of the event or so shortly thereafter that it is unlikely that the declarant had the opportunity to form the purpose of misstating his observation" (citation omitted)).

To the extent that any of Jones's statements may have been admissible to show his state of mind or demeanor after the shooting, the court later ruled

they were admissible to rebut the Commonwealth's presentation of the hospital video. *See* N.T., 11/8/21, at 35-39.

In addition, the court allowed Officer Pedro Ruiz to testify that Jones made the statements. *See id.* at 101-03 (court overruling Commonwealth's objection to defense questioning Officer Ruiz regarding Jones's statements to the police, to show Jones's demeanor and state of mind, in rebuttal to the Commonwealth's introduction of the hospital video), 103-08 (Officer Ruiz testifying that Jones told him he had been attacked). Jones also testified, and recounted what he told the police after their arrival. *See* N.T., 11/10/21, at 93-96. As these statements came into evidence by other means, any error in the court's initial ruling that the recordings of the statements were inadmissible was harmless beyond a reasonable doubt. *See Commonwealth v. Allshouse*, 36 A.3d 163, 182 (Pa. 2012).

### E.    911 Calls

Jones next contends that the court erred in allowing the Commonwealth to introduce the audio recordings of the 911 calls made by the fleeing campers. Jones argues these were highly inflammatory and had little probative value. He asserts that testimony about the calls and transcripts of the calls would have been more appropriate.

Recordings of 911 calls can assist in establishing a timeline of events and the mental state of the callers. *See Commonwealth v. Wright*, 961 A.2d 119, 151 (Pa. 2008). Here, considering Jones's allegations that the campers had assaulted him, the court ruled that the calls were probative of

whether the other campers "were acting in concert, whether or not they were being aggressive or in an emotional state or angry or volatile[.]" N.T., 9/10/21, at 85. The court determined the recordings were the best evidence of the campers' response to "an ongoing criminal episode." *Id.* at 84-88; *see also id.* at 83 (court ruling that transcript of 911 calls was insufficient to replace recording, stating, "Reading I can't get intonation, emotion, which is relevant," and, "You can't tell if it's faltering or hesitating. You can't tell if they are sure. You can't decide if they are actually in fear or not actually in fear. You can't get a gauge whether they are playing with the cops or not playing with the cops"). It concluded that the probative value of the calls outweighed the risk of unfair prejudice. *Id.* at 88. This was not an abuse of discretion.

## F.    Toxicology Expert

Jones argues the court erred in allowing Dr. Ian Hood to testify that the marijuana found in the blood of one of the victims, Eric Braxton, would have made him less aggressive:

> Q. And in your - - based on your training and experience, does marijuana tend to make you more or less aggressive?
>
> A. It tends to mellow you out, I think is what most people would describe it as doing, so you become less aggressive.

N.T., 11/3/21, at 201-02. Jones argues there was no foundation for Dr. Hood's opinion on toxicology, as he was only admitted as an expert in forensic pathology. Jones asserts this testimony was beyond the scope of Dr. Hood's expertise, and undermined Jones's self-defense claim.

This claim lacks merit, as Dr. Hood laid a foundation for his expert knowledge. *See* Pa.R.E. 702 (providing requirements for admissibility of expert opinion). After Dr. Hood offered the above testimony, the court asked him whether it was in his area of expertise. Dr. Hood responded,

> I did testify on the effects of drugs and ethanol routinely, especially down in Philadelphia. So it is certainly something that you receive training in as a forensic pathologist. And I certainly have gone to multiple workshops and training sessions involving the effects of drugs, especially nowadays since we are getting so many new drugs.

N.T., 11/3/21, at 202-03. Dr. Hood also agreed that his testimony was "to a reasonable degree of certainty in [his] field as a forensic pathologist." *Id.* at 203.

Furthermore, Dr. Hood explained that the level of marijuana found in Braxton's blood was "a really quite low level. You could even reach that if you were -- especially if you were, say, in a confined environment and somebody else is smoking, but you are not," and that "**the level is so low that it would have little effect on anyone**." *Id.* at 201, 203 (emphasis added). Therefore, even if court improperly allowed Dr. Hood's testimony on this point, any such error was harmless.

**G. Cross-Examination on Jones's Post-Arrest Silence**

In Issue E, Jones argues the court erred in permitting the Commonwealth to cross-examine him regarding certain things he did not say to the police after the shooting. Jones asserts the prosecutor asked him why he had not complained about any injuries other than to his foot and jaw;

expressed any concern for the deceased; offered specific details about the campers' alleged assault of him; explained that he had been in fear of injury or death; or explained why he could not have stayed in the car or retreated. Jones claims that not only did these questions violate his right to silence, but also they impermissibly shifted the burden to him to prove self-defense.

During Jones's direct testimony, he testified that he explained to the police that he had been attacked and had acted in self-defense:

Q. [W]hen the police show up, how do you feel?

A. I felt relief. I felt relief that they weren't going to be able to attack me and then I could explain to the police what happened.

Q. At the scene, did you tell the police what happened?

A. I tried a few times to let them know what had happened. I knew that they — obviously, they knew that I had a gun and I had fired it. I was trying to explain to them why I had fired it.

Q. Did you tell them specifically that you shot somebody?

A. I did. I assumed they knew that when they were — I mean, they took — they just took the firearm off me.

Q. Did you talk about any of your injuries to them?

A. I did. I told them that I got my ass kicked by more than one person, that my jaw might be broken, that my ankle was broken. I said it was broken because I couldn't walk on it and I told them that.

. . .

Q. When you arrived at the — during the ride to the police station, are you still making statements to the police?

A. Yes. I mean, I kept trying to explain to them that — I kept saying, I am not a bad guy. You know, people — that they attacked me. I was — I was concerned about being arrested for defending myself and I was trying to explain that to them.

- 18 -

N.T., 11/10/21, at 93, 96.

On cross-examination, the Commonwealth asked for a sidebar conference and asked the court to rule on whether, by testifying about his statements to police, Jones had opened the door to cross-examination on information he had left out those statements. The court ruled that the Commonwealth could ask Jones the questions, and that Jones could respond that the officers had told him not to make any statements. *Id.* at 119-20.

We find this issue waived, as Jones did not object to the court's ruling at sidebar and did not object to the prosecutor's subsequent questions on cross-examination. *Id.* at 119-28.

Even if it were not waived, we would not find an abuse of discretion. The prohibition on questions seeking to expose a defendant's silence does not apply where the defendant did not remain silent. *Commonwealth v. Jermyn*, 533 A.2d 74, 81 (Pa. 1987). A defendant's post-arrest statements to the police are permissible for impeachment purposes if the defendant offers contrary testimony about the content of those statements. *See Commonwealth v. Turner*, 454 A.2d 537, 539-540 (Pa. 1982) ("Silence at the time of arrest may become a factual inconsistency in the face of an assertion by the accused while testifying at trial that he related [his version of events] to the police at the time of arrest when in fact he remained silent"); *Commonwealth v. Copenhefer*, 719 A.2d 242, 251 (Pa. 1998) ("[W]here a prosecutor's reference to a defendant's silence is a fair response to a claim

made by defendant or his counsel at trial, there is no violation of the Fifth Amendment privilege against self-incrimination").

Here, the police did not question Jones. Jones nonetheless voluntarily made certain statements to the police and testified on direct examination that he had explained to the police what had happened during the alleged attack. The Commonwealth was therefore permitted to question him about the extent of the explanation he had volunteered and expose any inconsistencies between those statements and his trial testimony. The issue thus warrants no relief.

## II. Continuance Request

Jones argues the court erred in denying his request for a trial continuance so that he could review the results of the firearm test. According to Jones, "This testing was for the purpose of establishing how far apart the parties were when the shots were fired." Jones's Br. at 55. Jones asserts that the defense had been requesting this discovery for a year and a half prior to trial. He claims that he requested that the court grant him at least two months to review the results before jury selection. N.T., 9/22/21, at 26-36. The court denied the request and granted a shorter continuance. *Id.* at 38. Jones ultimately received the test results on September 30, 2021, jury selection began on October 4, 2021, and the parties opened to the jury on November 1, 2021—just one month after he had received the test results.

Jones challenges only the denial of the continuance. He does not argue the court erred in admitting the results of the firearm test. "The grant or denial

of a motion for a continuance is within the sound discretion of the trial court and will be reversed only upon a showing of an abuse of discretion." *Commonwealth v. Norton*, 144 A.3d 139, 143 (Pa.Super. 2016) (citation omitted). The denial of a continuance is subject to harmless error analysis. *Commonwealth v. Sandusky*, 77 A.3d 663, 672 (Pa.Super. 2013). Thus, "[a] bald allegation of an insufficient amount of time to prepare will not provide a basis for reversal of the denial of a continuance motion." *Commonwealth v. Antidormi*, 84 A.3d 736, 745 (Pa.Super. 2014) (citation omitted). "An appellant must be able to show specifically in what manner he was unable to prepare for his defense or how he would have prepared differently had he been given more time. We will not reverse a denial of a motion for continuance in the absence of prejudice." *Id.* at 745-46 (citation omitted).

Here, the result of the firearms test was inconclusive. The firearms expert could not render an opinion regarding a muzzle-to-target distance. N.T., 11/4/21 (afternoon), at 56. Jones has not explained how, had he had more time to review this report, or to submit the evidence to other experts for testing, he would have changed his defense. He has therefore failed to establish prejudice, and any error in this regard was at most harmless.

## III. Questioning of Jurors

In Issue C, Jones argues that while the jury was in the hallway directly behind the courtroom, the court reprimanded defense counsel that he had made a statement that was not supported by the record. The court admonished counsel as follows:

THE COURT: You made the conclusionary statement that he pled guilty to punching someone that is not supported by the record. I accepted your representation as to that. That is not what happened, period. It's not what happened. That's the problem.

. . .

I will never rely on your representations again, Mr. Hone. Is that your argument, that I should have verified every fact that you represented prior to my ruling?

Wait a minute. Exactly that is your argument. I accept that argument. I reject that argument, and I will never do it again. Do you understand?

[DEFENSE COUNSEL]: I disagree with that assessment, Your Honor.

THE COURT: Bring the jury in.

N.T., 11/3/21, at 173-74, 175. Jones asserts the jury entered the courtroom immediately afterward. Jones claims he asked the court to question the jurors as to whether they had heard the exchange, but the court refused. Jones also asserts the court repeatedly interrupted counsel on cross-examination and baselessly threatened to hold counsel in contempt of court.

These claims are waived. After the above exchange, Defense counsel made the following request:

I just had a question before the jurors came in. I know that you and I had a disagreement before we started for the afternoon session. I am concerned because of the strength of the argument that there is a possibility they may have heard something, because they came in right after that.

I just wondered if at some point we could possibly just do a questioning or something, if they heard any of the court proceedings or anything before they came in?

N.T., 11/3/21, at 241.

- 22 -

The court responded:

THE COURT: I have no reason to believe they were anywhere near to hear in the courtroom. Mr. Smith, were they near?

THE TIPSTAFF: They were in the back hallway, but chatting with Bob.

THE COURT: So they weren't –

THE TIPSTAFF: They were not right there.

[DEFENSE COUNSEL]: It seemed like they came right in. I just wanted to be extra cautious.

THE COURT: No. I think it is a legitimate concern.

THE TIPSTAFF: I know they were not up against the door. They were back against the wall.

[DEFENSE COUNSEL]: Okay.

[DEATH PENALTY COUNSEL]: Thank you.

*Id.* at 241-42.

Because Jones acquiesced in the court's ruling, he cannot now complain about it on appeal. *See Commonwealth v. English*, 667 A.2d 1123, 1127 (Pa.Super. 1995) (stating defendant's "choice having been made to forego inquiry of any possible jury taint cannot be resurrected in either the post-verdict or appellate format").

Jones's additional arguments that the court improperly interjected or threatened defense counsel with contempt are waived. They are not included in his Statement of Questions Involved, or fairly suggested thereby. *See* Pa.R.A.P. 2116(a). Jones also failed to timely preserve these claims by not making a specific request for relief. *See* N.T., 11/3/21, at 111; N.T., 11/4/21 (Morning Session), at 59-60.

## IV. Brady Motion and Missing Evidence Instruction

In Issue D, Jones complains the court erred in overruling his **Brady** motion. He claims Officer Pedro Ruiz took pictures of the injuries to Jones's face and foot with a camera that was kept in the glove box of the police cruiser. Jones asserts the police were later unable to locate the photos, which he maintains were critical to his self-defense claim. He argues that the still images extracted from Officer Ruiz's bodycam footage, which the court ruled were sufficient replacements, were blurry, grainy, poorly lit, or had glare. He also argues the missing photos were the only pictures of his injuries taken before they were cleaned and treated. Jones argues the court erred in refusing to instruct the jury that it could infer the missing photographs would have been favorable to the defense.

"There are three components of a true **Brady** violation: [t]he evidence must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." **Commonwealth v. Natividad**, 200 A.3d 11, 25 (Pa. 2019) (citation omitted). Evidence is material in this context "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. . . . A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." **Id.** (some internal quotation marks and citations omitted). "The mere possibility that an item of undisclosed information might have helped the defense, or might have

affected the outcome of the trial, does not establish 'materiality' in the constitutional sense." *Id.* (citation omitted). Whether a *Brady* violation warrants the grant of a new trial "presents a question of law, for which our standard of review is *de novo* and our scope of review is plenary." *Commonwealth v. Bagnall*, 235 A.3d 1075, 1084 (Pa. 2020).

A missing evidence instruction is warranted when (1) the evidence is available to the Commonwealth and not the defense, (2) "it appears the item contains or shows special information material to the issue," and (3) "the item would not be merely cumulative evidence." Pa. SSJI (Crim) § 3.21B. "Our standard of review when considering the denial of jury instructions is one of deference—an appellate court will reverse a court's decision only when it abused its discretion or committed an error of law." *Commonwealth v. Sebolka*, 205 A.3d 329, 342 (Pa.Super. 2019) (citation omitted).

The court found the missing photos of Jones's injuries were not material because they were cumulative of other evidence. It found the photographs "were not unique" and "everything that could possibly be depicted about [Jones's] condition at the scene, at the hospital, at the police station, is depicted in other photographs and other records and is available to [Jones] through a multitude of witnesses[.]" N.T., 9/27/2021, at 32-33; *see also* N.T., 11/10/21, at 191.

The court did not abuse its discretion. As Jones acknowledges, Officer Ruiz's bodycam captured him taking the missing photos, and the stills extracted from footage showed Jones's injuries prior to medical treatment.

*See* N.T., 9/24/21, at 19-21; Exs. CS-42, CS-43, CS-44. There were also stills from the bodycam footage showing the injuries after the medical staff cleaned and treated them. *See* N.T. 9/24/21, at 21-23; Exs. CS-45, CS-46, CS-47, CS-48. However, in addition to the stills extracted from the bodycam, the jury saw two photographs of Jones's face that Officer Ruiz took with his cell phone, when Jones was at the hospital but had not yet been treated. *See* N.T., 9/24/21, at 13-14, 18; Exs CS-38, CS-39. The defense also offered expert testimony, hospital records, and x-rays substantiating Jones's injuries. N.T., 11/10/21, at 30-43; D-61, D-66, D-67, D-68.[7] Because of the ample evidence showing the extent of Jones's injuries, the missing photos did not warrant a missing evidence instruction or a new trial.

## V.    Motion to Sever Firearms Charge

In Issue F, Jones argues the court erred in denying his motion to sever the firearms charge. He claims the evidence proving this charge was irrelevant to the other charges, and highly prejudicial.

Pursuant to Rule 563, multiple offenses may be charged and tried together if they are "based on the same act or transaction" and "the evidence of each of the offenses would be admissible in a separate trial for the other and is capable of separation by the jury so that there is no danger of confusion[.]" Pa.R.Crim.P. 563(A). Under Rule 583, however, the court may

---

[7] According to the trial court, on November 9, 2021, a paramedic also testified as to Jones's physical condition and the treatment he provided. *See* Trial Ct. Mem. Op. at 36, 89.

order separate trials of offenses "if it appears that any party may be prejudiced by offenses . . . being tried together." Pa.R.Crim.P. 583. The party moving for severance bears the burden of demonstrating prejudice. **Commonwealth v. Holt**, 273 A.3d 514, 541 (Pa. 2022). Prejudice in this context results when "the evidence tended to convict the appellant only by showing his propensity to commit crimes, or because the jury was incapable of separating the evidence or could not avoid cumulating the evidence." **Commonwealth v. Hobel**, 275 A.3d 1049, 1067 (Pa.Super 2022) (citation omitted). "A motion to sever charges is addressed to the discretion of the trial court and will not be disturbed on appeal absent a manifest abuse of discretion." **Holt**, 273 A.3d at 541.

Here, the charges all arose of the same factual scenario, and each entailed proof that Jones possessed a firearm. To prove Jones committed the offense of firearms not to be carried without a license, the Commonwealth was required to prove that Jones had concealed his firearm in a vehicle or upon his person. **See** 18 Pa.C.S.A. § 6106(a)(1). The evidence was that he did so immediately before he shot Braxton. The cases were thus factually intertwined. Moreover, firearms not to be carried without a license does not require evidence of prior crimes. Thus, there was no risk that the jury would consider the evidence supporting the instant firearms charge as proof of Jones's criminal tendencies. And, to further reduce any prejudice from the evidence proving the firearms charge, the Commonwealth stipulated that Jones had lawfully purchased the firearm and was lawfully entitled to apply

for a concealed carry permit. **See** N.T., 11/4/21 (Afternoon Session), at 126. The court did not abuse its discretion in denying the motion to sever.

## VI. Jury Instructions

In issue G, Jones lodges two attacks on the final jury instructions. "When reviewing a challenge to a jury instruction, we review the charge as a whole to ensure it was a fair and complete statement of the law." **Commonwealth v. Towles**, 106 A.3d 591, 607 (Pa. 2014) (citation omitted). "Trial courts possess great discretion in phrasing jury instructions so long as the law is clearly, adequately, and accurately presented to the jury." **Id.**

### A. Prior Bad Acts of the Hill Brothers

Jones argues the court erred in failing to use either the standard jury instructions for prior bad acts evidence or his own suggested instruction in relation to the evidence of the Hill brothers' prior convictions. Jones asserts the language the court used instead was lengthy and repetitive and diminished the relevance of the Hill brothers' criminal histories. Jones alleges that the court should have instructed the jury that it could consider whether their records increased the likelihood that they were the aggressors or had testified untruthfully. Jones alleges that, instead, the court told the jury that it could give the evidence the weight it thought it deserved. He claims the court also implied that the Hill brothers' prior crimes should have little impact on the jury's consideration of their testimony.

The court found the standard jury instructions were inadequate, given the number of the prior bad acts introduced by the defense, the different

purposes for which they were being admitted, and the fact that they related

to two different witnesses. *See* Trial Ct. Mem. Op. at 71.

Regarding *crimen falsi*, the court instructed the jury as follows.

We heard and I instructed you very specifically about the prior record of Justin Hill and the prior record with regard to Brandon Hill. I am not going to go over the crimes. That's for you to recall what those crimes are, but there are certain crimes that can be used for one purpose. There's certain crimes that can be used for two purposes, so I am going to break them up.

Under the Rules of Evidence in Pennsylvania, a party may challenge the credibility of any witness. One permissible way of doing that is to introduce evidence that the witness has been convicted as an adult or an adjudicated delinquent -- that's what it is called when you are a juvenile -- for a crime of dishonesty.

Theft is considered, under the law of Pennsylvania, a crime of dishonesty. Robbery involves theft and so therefore robbery is considered a crime of dishonesty.

A juvenile is somebody who is less than 18 years old and an adult is somebody who is 18 years old or older.

There was evidence that Justin Hill and Brandon Hill were convicted of crimes of dishonesty. As I said, you may use that evidence to evaluate whether the witness told the truth in this case, meaning what, if any, impact does the fact that the witness was convicted of a crime of dishonesty have on whether you believe their testimony in this case. It doesn't mean whether you generally believe them or generally don't believe them. It's whether you believe their testimony in this case.

In deciding whether this prior crime affects the truthfulness of the witness, you should consider what's the crime, then you should consider how long ago the crime was committed and how it may affect the likelihood –- that the fact that they had that prior crime, what -- does that affect the likelihood that they are telling the truth or not.

You should also consider the facts and the circumstances of this case on whether or not, given what is at stake here in this case, that crime has any impact on whether or not they're telling the

truth. You may conclude -- basically, you can give the evidence whatever weight you think it deserves.

N.T., 11/12/21, at 153-55.

Regarding crimes of aggression, the court told the jury:

The last way a conviction of criminal record can affect a witness' –- whether you want to rely on a witness or –- I'm sorry –- a witness' testimony –- is –- or a criminal case –- is if the witness is convicted of a crime of aggression.

This is a case of –- where force was used. Everybody has conceded force was used and that -– they have argued who is the one who initiated the force. The Commonwealth has argued that the defendant initiated the initial dispute but –- ultimately, you are going to have to decide what happened at the time of the shooting, but the Commonwealth has argued that Justin Hill was the aggressor –- I'm sorry.

The defendant has argued that Justin Hill was the aggressor. The Commonwealth has argued that the defendant was the one who started the physical and verbal aggression.

You are going to have to make a decision about –- you may feel the need to make the decision about who started that whole thing. In considering that, you may consider that Justin Hill had been convicted of robbery in 2011, robbery in 2012 or had crimes that arose in 2011, 2012, and a prior aggravated assault conviction. You may consider those three convictions in determining whether or not you believe Justin Hill was the aggressor.

In deciding whether you -- whether that has any impact on your view of whether Justin Hill was aggressive and whether he was the aggressor, you should consider again the same factors I mentioned before.

How long ago was that criminal offense? Were the facts that you heard about the criminal offense -- were they similar to what happened here or were they not similar to what happened here? Does the fact that he engaged in that conduct at that point -- in any way similar to what he is alleged to have done here? Does it have an impact on whether you believe, because he did that, therefore he must be the aggressor here?

That's again for you to decide, but it is admissible evidence for that purpose and you may consider it for that purpose.

But I will tell you what you can't do. There's two very important things you can't do. The defendant was not aware of any of this. There's no evidence the defendant was aware of any of this at the time of the events on trial, so that can have no impact on your view about what he thought was necessary to protect himself, if that's what you are evaluating. So you may not use it in evaluating what the defendant thought because there's no evidence that he was aware of any of that -- of any of those convictions.

The other thing that's very important for you to understand is this: We have procedures and rules that go on and on and on and there's a reason for it.

We don't smear people. People are not to be disregarded because they have a criminal record. What we do allow is that if your criminal record demonstrates a particular quality like dishonesty or a particular quality like aggressive behavior, then it is appropriate for a jury to hear about that and consider that for that purpose, but what you can't do is say: Well, I don't like that person and so therefore I am going to do -- whatever it is you want to do -- because you are unhappy that the person has a criminal record or you don't like the person or you don't -- that, you cannot do.

*Id.* at 158-61.

The court did not excuse the prior bad acts of the Hill brothers or diminish their relevance. The court properly advised the jury that if a criminal record demonstrates dishonesty or aggression, then the jury can consider it for that purpose when deciding the instant case. It also cautioned the jury that it could not decide the case based on a general bias against persons with criminal records. The court did not abuse its discretion.

## B.    Involuntary Manslaughter

Jones next contends that the court erred in refusing his request to instruct the jury regarding involuntary manslaughter. Jones asserts there was

- 31 -

evidence indicating he was "intoxicated, had been beaten to unconsciousness and was in an extremely chaotic situation, in a dark wooded area, in the middle of the night." Jones's Br. at 85. Jones argues this evidence would have allowed a jury to conclude that he was grossly negligent in firing the firearm.

A defendant is only entitled to a jury charge on a lesser-included offense where the evidence would support a verdict of guilty on the lesser-included offense. *Commonwealth v. Phillips*, 946 A.2d 103, 110 (Pa.Super. 2008). Thus, "a homicide defendant is entitled to a charge on involuntary or voluntary manslaughter only if the evidence adduced at trial would reasonably support a verdict on such a charge." *Commonwealth v. Soltis*, 687 A.2d 1139, 1141 (Pa.Super. 1996).

Evidence supports an involuntary manslaughter instruction where it "tends to show that [the defendant] acted recklessly or with gross negligence in causing [the victims'] death." *Id.*; *see also* 18 Pa.C.S.A. § 2504(a) (defining involuntary manslaughter). A person acts "recklessly" when he "consciously disregards a substantial and justifiable risk" that a material element of the offense exits or will result from his conduct, and the disregard of the risk "involves a gross deviation from the standard of conduct that a reasonable person would observe in the actor's situation." 18 Pa.C.S.A. § 302(b)(3). A person acts "negligently" when he "should be aware of a substantial and unjustifiable risk" caused by his actions but fails to perceive it, and the failure "involves a gross deviation from the standard of care that a

reasonable person would observe in the actor's situation." 18 Pa.C.S.A. § 302(b)(4).

Here, not only did multiple witnesses testify that Jones intentionally shot the victims, but Jones himself also testified that he shot Braxton because Braxton was trying to grab him, and that he fired at Hill and his sons because they were running towards him. **See** N.T., 11/10/21, at 90, 113. He conceded that he aimed the gun intending to hit his targets. **Id.** at 117-19. The evidence does not support the theory that Jones shot the gun recklessly or negligently. We find no abuse of discretion.

## VII. Sufficiency of the Evidence

In Issue H, Jones argues the evidence was insufficient to support the verdict because the Commonwealth did not offer evidence that could disprove his self-defense claim beyond a reasonable doubt. He alleges the evidence establishes that he was attacked and badly beaten, tried to escape, was attacked a second time, and feared for his life when he fired the shots that killed the victims.

We review this issue pursuant to the following standard.

> To determine the legal sufficiency of evidence supporting a jury's verdict of guilty, this Court must view the evidence in the light most favorable to the Commonwealth, which has won the verdict, and draw all reasonable inferences in its favor. We then determine whether the evidence is sufficient to permit a jury to determine that each and every element of the crimes charged has been established beyond a reasonable doubt. It is the function of the jury to pass upon the credibility of the witnesses and to determine the weight to be accorded the evidence produced. The jury is free to believe all, part or none of the evidence introduced at trial. The

facts and circumstances established by the Commonwealth need not be absolutely incompatible with the defendant's innocence, but the question of any doubt is for the jury unless the evidence be so weak and inconclusive that as a matter of law no probability of fact can be drawn from the combined circumstances.

***Commonwealth v. Hoffman***, 198 A.3d 1112, 1118 (Pa.Super. 2018) (quoting ***Commonwealth v. Feathers***, 660 A.2d 90, 94-95 (Pa.Super. 1995)).

Self-defense is an affirmative defense defined by Section 505 of the Crimes Code. That section provides that "[t]he use of force upon or toward another person is justifiable when the actor believes that such force is immediately necessary for the purpose of protecting himself against the use of unlawful force by such other person on the present occasion." 18 Pa.C.S.A. § 505(a). However, the use of deadly force is not justifiable if "(i) the actor, with the intent of causing death or serious bodily injury, provoked the use of force against himself in the same encounter; or (ii) the actor knows that he can avoid the necessity of using such force with complete safety by retreating." ***Id.*** at § 505(b)(2). Thus, self-defense is a complete defense when the evidence establishes,

[(1) The d]efendant reasonably believed that he was in imminent danger of death or serious bodily injury and that it was necessary to use deadly force against the victim to prevent such harm;

[(2) The d]efendant was free from fault in provoking the difficulty which culminated in the slaying; and

[(3) The d]efendant did not violate any duty to retreat.

*Commonwealth v. Knox*, 219 A.3d 186, 196 (Pa.Super. 2019) (quoting

*Commonwealth v. Mouzon*, 53 A.3d 738, 740 (Pa. 2012)).

It is the Commonwealth's burden to disprove a claim of self-defense

beyond a reasonable doubt. *Id.* The Commonwealth need only disprove one

element of a self-defense claim. *Mouzon*, 53 A.3d at 740-41. Because the

defendant must have reasonably believed the use of force was necessary, the

defendant must not have employed greater force than reasonably necessary.

*Commonwealth v. Truong*, 36 A.3d 592, 599 (Pa.Super. 2012) (*en banc*).

The trial court offered the following analysis of Jones's sufficiency

challenge:

> The entire incident began with an act of domestic violence perpetrated by [Jones] against his girlfriend. It continued with [Jones's] physical act of aggression against Arthur Hill who had merely attempted to peacefully intervene. When Mr. Hill's son punched him in response, [Jones] escalated the violence by threatening all of those present. [Jones], given the opportunity to cool off, chose not to remain in his girlfriend's vehicle or to retreat from the campsite, but rather chose to retrieve his handgun and shoot at unarmed campers, killing two of them. The physical evidence and eyewitness testimony established beyond a reasonable doubt that [Jones] was not severely beaten by multiple individuals and that at the time [he] discharged his weapon, none of the campers posed a threat to his safety. Given this sequence of events the Commonwealth's evidence was more than sufficient to prove beyond a reasonable doubt that [Jones] (1) did not reasonably believe that force was necessary to protect himself against death or serious bodily injury; (2) was not free from fault in provoking the use of force against him; and (3) violated his duty to retreat.

Trial Ct. Mem. Op. at 80.

Viewed in the light most favorable to the Commonwealth, the evidence was sufficient to disprove the self-defense claim. The Commonwealth presented evidence that Jones provoked the campers' initial use of force against him, justifying their decision to isolate him in the car; announced the campers were "going to pay"; could have waited safely in the car, but instead reapproached the camp-ground; shot Braxton even though Braxton had approached him in a non-violent manner; and then traveled 66 feet into the campground to shoot Hill, who was running away. Viewed in the light most favorable to the Commonwealth, this evidence establishes that Jones provoked the confrontation, escalated it when he could have retreated, and used a greater amount of force than was reasonably necessary. The sufficiency claim fails.

## VIII.  Weight of the evidence

In Issue J, Jones argues the guilty verdicts were against the weight of the evidence. He claims that the testimony that he sustained his injuries from one punch was so inconsistent with the evidence of his physical injuries as to shock one's sense of justice. He argues he presented scientific evidence that he had a broken jaw, swelling of his face and scalp, and a laceration of his lip. Jones claims he also had numerous fractures to his foot that an expert opined were the result of direct trauma and could not have occurred solely as the result of twisting. Jones claims this inconsistency proves the eyewitness testimony was not credible and that the campers were downplaying the harm

they did to him that night. Jones also argues Justin's and Brandon's criminal records prove they were not credible witnesses.

Jones argues that in contrast, he credibly testified as to how he sustained his injuries and why he was afraid for his safety. He also points out that he presented six character witnesses who testified to his peacefulness/non-violence, which, alone, raised a reasonable doubt as to his guilt. He claims that the testimony of his reputation for peacefulness and his credible account is "so clearly of greater weight than the inconsistent and incredible testimony of the Commonwealth witnesses, that to ignore it or to give equal weight with other facts is to deny justice." Jones's Br. at 111; *see id.* at 114.[8]

A challenge to the weight of the evidence "concedes that there is sufficient evidence to sustain the verdict but claims that 'notwithstanding all the facts, certain facts are so clearly of greater weight that to ignore them or to give them equal weight with all the facts is to deny justice.'" *Commonwealth v. Lyons*, 833 A.2d 245, 258 (Pa.Super. 2003) (quoting *Commonwealth v. Widmer*, 744 A.2d 745, 751-52 (Pa. 2000)). Because weighing the evidence is the task of the jury, a trial court may grant a new trial only where the verdict "is so contrary to the evidence as to shock one's

---

[8] Although the court sheet for November 9, 2021, indicates that Jones presented additional medical evidence and character witnesses on that date, Jones does not rely on any of this evidence to support his weight claim. *See* note 2, *supra*.

sense of justice." ***Commonwealth v. Clemens***, 242 A.3d 659, 667
(Pa.Super. 2020) (citation omitted).

Importantly, our review of the trial court's denial of a weight claim is
limited to assessing the decision for an abuse of discretion:

> Appellate review of a weight claim is a review of the exercise of
> discretion, not of the underlying question of whether the verdict
> is against the weight of the evidence. Because the trial judge has
> had the opportunity to hear and see the evidence presented, an
> appellate court will give the gravest consideration to the findings
> and reasons advanced by the trial judge when reviewing a trial
> court's determination [of whether] the verdict is against the
> weight of the evidence. One of the least assailable reasons for
> granting or denying a new trial is the lower court's conviction that
> the verdict was or was not against the weight of the evidence and
> that a new trial should be granted in the interest of justice.

***Commonwealth v. Bright***, 234 A.3d 744, 749 (Pa.Super. 2020) (quoting
***Commonwealth v. Clay***, 64 A.3d 1049, 1055 (Pa. 2013)).

The trial court offered the following reasoning for its denial of the weight
claim.

> The evidence introduced at trial overwhelmingly established that
> [Jones] did not act in self-defense, that he was not free from fault
> in provoking the use of violence against him, that he did not
> believe that deadly force was necessary to protect himself against
> death or serious bodily injury, and that he violated his duty to
> retreat. Contrary to [Jones's] assertions, the eyewitnesses were
> consistent with each other and were corroborated by the physical
> evidence documented at the scene and by the evidence regarding
> [Jones's] injuries. All of the eyewitnesses testified that [Jones]
> was the initial aggressor. They all testified that [Jones] was struck
> only once. They all testified that, after the initial incident in front
> of Kristen Wright's tent ended, there were no acts of aggression
> toward [Jones] and that there was nothing preventing him from
> leaving the campsite. [Jones's] injuries and, more importantly,
> the lack of injury to his person beyond that which would have
> occurred as a result of his having been punched and or which could

> have occurred as a result of his many falls as he ran from the scene, was, standing alone, sufficient to disprove [Jones's] claim that he was beaten, kicked, and stomped by multiple individuals as he lay unconscious on the ground. In light of this evidence, the jury's verdict cannot be said to have been "so contrary to the evidence as to shock one's sense of justice."

Trial Ct. Mem. Op. at 51-52.

The court did not abuse its discretion in rejecting the weight claim. The jury was free to disregard Jones's testimony and that of his character witnesses, especially given the number of substantially similar eyewitness accounts and the evidence that he traveled 66 feet after shooting Braxton before shooting Hill in the back.

Nor does the medical testimony in this case undermine the eyewitness accounts of how Jones sustained his injuries or corroborate Jones's account such that justice demands a new trial. Although Jones argues the injuries to his head could not have been caused by a single punch, he has already pointed out that Justin has a history of knocking people out with a single punch. *See* Section I.A., *supra*. Justin testified that he injured his hand when punching Jones. *See* N.T. 11/4/21, at 107, 110. Wright also testified that when Hill confronted Jones, Hill "probably" hit Jones before Justin hit him. *See* N.T., 11/5/21, at 24-25. The jury was free to accept any this testimony when considering how Jones sustained his head injuries.

Regarding Jones's foot injuries, although Dr. Daniel testified that at least a portion of the fractures were caused by direct trauma as opposed to twisting, he did not testify about the circumstances in which the injury occurred. *See* N.T., 11/10/21, at 38-39. Multiple eyewitnesses testified that Jones fell to the

ground after Justin punched him. Jones himself testified that his ankle buckled when he left the car and that he fell as he ran after firing the shots. *See id.* at 89, 92; *see also id.* at 82 (Jones testifying that he weighs 205 pounds). The jury was free to reject Jones's suggestion that these injuries could only have occurred during a brutal and unprovoked assault by the campers.

## IX. Sentencing

Finally, in Issue I, Jones alleges the court abused its discretion in imposing sentence.

We cannot address a challenge to discretionary aspects of a sentence unless it raises a substantial question. *Commonwealth v. Lynch*, 242 A.3d 339, 346 (Pa.Super. 2020).[9] "A substantial question exists when the appellant makes a colorable argument that the sentencing judge's actions were either inconsistent with a specific provision of the Sentencing Code or contrary to the fundamental norms underlying the sentencing process." *Id.* In assessing whether Jones has raised a substantial question, we review only the Rule 2119(f) statement and the statement of questions presented. *See Commonwealth v. Provenzano*, 50 A.3d 148, 154 (Pa.Super. 2012); *see also* Pa.R.A.P. 2119(f).

In his Rule 2119(f) statement, Jones claims the court's imposition of consecutive sentences on each count was unduly harsh and a result of the

---

[9] A discretionary sentencing claim must also be preserved in the trial court, raised in a timely appeal, and included in a Pa.R.A.P. 2119(f) statement. *See Lynch*, 242 A.3d at 346. These requirements are met here.

court's reliance upon "improper factors." Jones's Br. at 19-20. Jones also states that the court did not state its reasons for imposing sentences exceeding the aggravated range of the sentencing guidelines, and that it did not consider his age, his history, and his rehabilitative needs. In his question presented, Jones suggests his sentence is excessive considering his "personal circumstances, his character, and the circumstances of the offense." *Id.* at 15. These allegations raise a substantial question. *See Commonwealth v. Salter*, 290 A.3d 741, 748 (Pa.Super. 2023); *Commonwealth v. Dodge*, 77 A.3d 1263, 1271-72 (Pa.Super. 2013).

Jones elucidates in the argument section of his brief that he contends the court improperly gave undue weight to the gravity of his crimes, which was already accounted for by the sentencing guidelines. *See* Jones's Br. at 98-99. Jones further argues that the court failed to meaningfully consider the character witnesses he presented at sentencing. He asserts the court disregarded their testimony and told them, "The man you're describing is not the man he is." *Id.* at 96-97 (citing N.T., 11/18/21, at 124). Jones also argues that the court failed to consider the sentencing guidelines. *Id.* at 98-99.[10] Finally, Jones contends the court improperly considered his failure to apologize in allocution when he had a fifth amendment right to abstain from allocution.

---

[10] We note this argument differs slightly from the argument Jones raises in his Rule 2119(f) statement, that the court failed to state its reasoning for departing from the guidelines.

*See id.* at 97-98 (citing N.T., 11/18/21, at 138-40; *Mitchell v. U.S.*, 526 U.S. 314, 327 (1999)).[11]

> We apply the following standard of review to these claims.
>
> We will not disturb a sentence absent an abuse of discretion. Trial courts have broad discretion over sentencing because they are in the best position to determine the proper penalty for a particular offense based upon an evaluation of the individual circumstances before it. An abuse of discretion may not be found merely because an appellate court might have reached a different conclusion, but requires a result of manifest unreasonableness, or partiality, prejudice, bias, or ill-will, or such lack of support so as to be clearly erroneous.

*Commonwealth v. Goodco Mech., Inc.*, 291 A.3d 378, 405 (Pa.Super. 2023) (quotation marks and citations omitted). We give great deference to the trial court, "as [it] is in the best position to measure factors such as the nature of the crime, the defendant's character, and the defendant's display of remorse, defiance, or indifference." *Commonwealth v. Mouzon*, 828 A.2d at 1128.

The Sentencing Code requires the trial court to "follow the general principle that the sentence imposed should call for total confinement that is consistent with section 9725 (relating to total confinement) and the protection of the public, the gravity of the offense as it relates to the impact on the life of the victim and on the community, and the rehabilitative needs of the defendant." 42 Pa.C.S.A. § 9721(b). The court may impose a sentence of total

---

[11] Jones abandons his argument that the court failed to consider his age. Jones argues the court failed to consider his history and rehabilitative needs but does not explain what aspect of his history or rehabilitative needs the court failed to consider. We find these claims waived for lack of development.

confinement "if, having regard to the nature and circumstances of the crime and the history, character, and condition of the defendant," it finds confinement necessary because (1) there is an undue risk that the defendant will commit another crime if subject to lesser restrictions, (2) a correction institution can provide needed treatment, or (3) "a lesser sentence will depreciate the seriousness of the crime of the defendant." *Id.* at § 9725. The court must also consider the sentence ranges suggested by the sentencing guidelines. *Id.* at § 9721(b); *see* 204 Pa.Code §§ 303.1–303.18(c). It must state the reasons for the sentence imposed at the time of sentencing. 42 Pa.C.S.A. § 9721(b); Pa.R.Crim.P. 704(C)(2).

This Court will vacate a sentence falling outside the guidelines if it is unreasonable. 42 Pa.C.S.A. § 9781(c). "The term 'unreasonable' generally means a decision that is either irrational or not guided by sound judgment." *Commonwealth v. Daniel*, 30 A.3d 494, 497 (Pa.Super. 2011). A sentence can be deemed unreasonable either upon review of the elements contained in Section 9781(d)—(1) "the nature and circumstances of the offence and characteristics of the defendant," (2) the sentencing court's opportunity to observe the defendant, (3) the findings of the sentencing court, and (4) the sentencing guidelines—or "if the sentencing court failed to take into account the factors outlined in 42 Pa.C.S.A. § 9721(b)." *Id.* "Our scope of review is plenary, and we may review the entire record." *Goodco Mech., Inc*, 291 A.3d at 405.

First, Jones's claim that the court failed to consider the sentencing guidelines is belied by the record. The court stated at sentencing that it had reviewed the guidelines. **See** N.T, 11/18/21, at 3; **see also id.** at 112-13 (Commonwealth stating the guidelines ranges).

We also reject any contention that the court failed to state its reasoning for the sentences. The court placed extensive reasoning on the record. **See id.** at 123-48. In sum, the court stated it based the sentence on Jones's lack of remorse, "the horrible circumstances and the facts of this case," and "the impact the crimes have had on the victims [and] the victims' families." **Id.** at 137-40, 140, 141.

We likewise find no merit to Jones's argument that the court failed to meaningfully consider the character witnesses. The court heard both the character testimony of 11 witnesses and the victim impact statements of 14 witnesses. **Id.** at 5-65, 67-107. After argument, the court addressed the character witnesses, stating, "What I don't understand is that the man you are describing is not the man he is." **Id.** at 124. The court then recounted the impact of the crimes on the victims' families. Then it addressed the character witnesses again, saying,

> I don't understand how a man who – and **I believe your testimony. I am accepting your testimony presented by the defense because I find it to be credible.**
>
> I don't understand how a man who was helping these women through domestic crisis and domestic violence goes to a campsite and engages in that exact same conduct.

**Id.** at 125 (emphasis added). The court also said,

> The version this defendant has sold you on, because I assume you all are believe [sic] whatever he said, because you are close friends, has nothing to do with the truth. I know you haven't seen the evidence. I know you haven't seen the police reports. I know you haven't seen all of the photographs, but his story is false.

*Id.* at 126-27. The court went on to recount for the character witnesses the facts of the crime and the evidence disproving Jones's version of events. *Id.* at 127-40. Within this recitation, the court stated, "I don't know how he treated his students, but he didn't treat Eric Braxton like a human being, the human being that he was." *Id.* at 133. Later, the court pondered, "Can you just be that one person in the moment and be somebody else all of the other time? And I don't know." *Id.* at 138.

The court's statements reflect that the court meaningfully considered the testimony of the character witnesses but found their testimony did not reflect Jones's character on the night of the shooting and did not outweigh the heinousness of his actions or its impact on the victims.

We also disagree with Jones's assertion the court was unable to consider the gravity of Jones's crimes because this factor was contemplated by the guidelines. A court may consider the gravity of the offense when deciding whether to depart from the sentencing guidelines if the case "is compellingly different from the 'typical' case of the same offense," or if the information reflects upon the defendant's character. *Commonwealth v. Robertson*, 874 A.2d 1200, 1213 (Pa.Super. 2005). Furthermore, a court does not abuse its discretion so long as it has other reasons to deviate from the guidelines. *Commonwealth v. Shugars*, 895 A.2d 1270, 1275 (Pa.Super. 2006); *see,*

*e.g.*, *Commonwealth v. Sheller*, 961 A.2d 187, 192 (Pa.Super. 2008) (finding even if court had considered factors going to the gravity of the offense when upwardly departing from the guidelines, the court recited proper factors it took into consideration, such as impact of the crime on the relatives of the victim).

Here, the court observed that "this is not the average murder case," considering the impact of the crime on the victims' families. N.T., 11/18/21, at 141. The court was therefore permitted to consider the egregiousness of the crime and the impact on the victims when deciding to depart from the guidelines.

Finally, we address Jones's argument that the court improperly considered his failure to apologize in allocution when he had a Fifth Amendment right to abstain from allocution. At sentencing, the court made the following statement regarding Jones's lack of remorse:

> [A]nother major factor in my consideration of sentence is – I rarely see a criminal defendant at the time of his crimes. I usually see them afterwards.
>
> I see them – most – now, I see them when we're in court. They've had attorneys. They have been prepared. They come and testify. They thought about it. They know the words to say and how to say them.
>
> But this defendant, because of the bravery of the local police officers running in with an armed subject, an active shooter as it is called, meaning somebody with a gun is shooting and killing people in an uncontrolled environment, where there's woods and dark and you don't have any idea, like these people -– these people had no idea. At least this officer was trained and is armed.

These people are not trained. They're not armed and they have watched already someone get shot. This defendant, during the middle of that – there cannot be more of a nightmare scenario for human beings to be unarmed where you know – not where you think – you know he's trying to kill people – are hiding in the woods trying to save themselves, at the same time no doubt wanting with every fiber of their being to go and help someone that they love, but can't. They're crying. They're upset. They're showing empathy and compassion and fear like human beings do.

And then we come up on the body camera of the responding officer and what is the emotional state of the defendant? Is he crying? Is he in fear? Is he asking who did I kill? Who did I kill? Who did I kill? Are they alive?

No. There was no compassion, no empathy, no remorse. From minute one, it's about him. I am the victim. I want to talk. Don't do your job, Officer. I get the attention. Take the time talking to me because I have a story ready. Don't wipe the blood off my face, he says, because he wants the jury to see it. . . .

Everybody is different and I couldn't tell with this defendant until I saw – through this entire interaction with him in this courtroom, he has never, at all, ever shown any degree of remorse.

These lovely people behind you, sir, have apologized for the harm you have caused these very decent people on the other side of the courtroom, but you have not. They have acknowledged the pain that you have caused, but you have not. They have acknowledged the pain and heartache that these people are going to experience until the day that they pass on and you have not. You don't deserve these people.

It amazes me that after all of this time, after all of these years, you have absolutely nothing to say to them. That makes my job very easy.

They deserve better than that. Not that they want to hear any apologies from you, but at least they would like some acknowledgment that the loss of their loved one means something, which apparently it doesn't to you. You have never -- all of the ranting at the crime scene to the officer, all the ranting at the hospital, all of the court proceedings, all of the testimony, not once, not once.

> And today, you still have nothing to say about the victims behind you and the two men who will never be able to live the rest of their lives, not a word.

*Id.* at 137-40.

Thus, while the court commented that Jones had never addressed the victims, it did not make this remark solely within the context of allocution. *See Commonwealth v. Bowen*, 975 A.2d 1120, 1127 (Pa.Super. 2009) ("silence at sentencing may not be the sole basis for finding that a defendant lacked remorse"). Rather, the court considered Jones's lack of hesitation or empathy on the night of the crime, the lack of remorse he displayed throughout the court proceedings, and the fact that he had not reached out to apologize to any of the victims who testified prior to the sentencing hearing. The court did not abuse its discretion when imposing sentence.

Judgment of sentence affirmed.

Judgment Entered.

*Benjamin D. Kohler*

Benjamin D. Kohler, Esq.
Prothonotary

Date: 3/27/2024